UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 17 CR 455-1 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| FERDINAND ECHAVIA | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by JOSEPH BEEMSTERBOER, Acting

Chief of the Fraud Section, Criminal Division, United States Department of Justice,

respectfully submits its sentencing memorandum for Ferdinand Echavia ("Echavia").

## I.    Overview

On June 12, 2014, Echavia stood in court before the Honorable John J. Tharp,

Jr.   Echavia had pled guilty to participating in a criminal conspiracy in connection

with a home health company called Goodwill Home Healthcare and he was appearing

for sentencing.[1]   At the hearing, Echavia told Judge Tharp:

> This is the very first time I disrespect the law. . . .   I am the only
> support for . . . all the patients, sick patients, that need my care and
> services in their houses in the poor neighborhoods in the south side of
> Chicago and the mental hospital. . . .   This will not happen again.
> This will be the last time, the last time I stand before your Honor.
> You are not going to be dealing with me in a bad way again.

When he made this statement, Echavia was already deeply engaged in another

criminal conspiracy—at his own home health care company, called Care Specialists

Inc. ("Care Specialists").   After his plea in the Goodwill case, Echavia knew that he

---

[1] *United States v. Goodwill Home Healthcare, Inc., et al.*, No. 12 CR 622, Dkt. 216 at 53-54
(Transcript of Sentencing Hearing Before Judge Tharp).

would be excluded from participating in the Medicare program. But, he was unwilling to give up the unlawful profits he was earning from Care Specialists. So, he devised a plan in which he would transfer the company to his wife, Ma Luisa Echavia ("Ma Luisa"). Rather than living up to what he told Judge Tharp, Echavia just found ways to hide how he was violating the law. After transferring Care Specialists' ownership to Ma Luisa, the company also hired a new visiting nurse to replace Echavia, Reginald Onate ("Onate"). This was Onate's first job out of nursing school. He was to "take over" Echavia's patients, but Echavia continued to visit patients with Onate. He needed to—patients might refuse to allow Care Specialists to "visit" them without the cash payments Echavia was giving them. Not only did Echavia continue to pay cash bribes to patients on visits, but Care Specialists also persisted in the other types of fraud it had been engaged in for years. It cycled patients in and out of enrollment to increase their reimbursement, without regard to any medical need for services. It fabricated paperwork for patient visits, both before billing Medicare, and after claims were rejected for overlapping with the patient's hospital visits.

Echavia now faces sentencing for his role in the $6.3 million fraud he initiated and orchestrated at Care Specialists. Echavia's conduct, both in the offenses and the actions he took to conceal them, show a lack of respect for the judicial system. It demonstrates how he callously viewed patients as a means to get money from Medicare, rather than vulnerable members of the community. For these reasons, as set forth more fully below, the government agrees with Probation's recommendation

that a within-Guidelines sentence of 108 months of imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553.

## II.     Procedural Background

Echavia was charged by Indictment in July 2017 and again by Superseding Indictment in December 2019.[2]  Both charged Echavia, Ma Luisa, and Angelita Newton ("Newton") with conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349.   Echavia alone was also charged with three counts of health care fraud, in violation of Title 18, United States Code, Section 1347.   The health care fraud charges alleged specific episodes of care for three patients of Care Specialists that were false and fraudulent.   During the conspiracy, Care Specialists received at least $6.3 million in fraudulent payments.

Echavia pled guilty to Count One of the Superseding Indictment on January 21, 2020.   Ma Luisa also agreed to plead guilty before trial.   Newton did not, and on February 14, 2020, a jury convicted her of one count of conspiracy to commit health care fraud and wire fraud.

## III.    Facts of the Offense

### A.     Care Specialists

Echavia was the sole owner and president of Care Specialists from its incorporation in February 2009 until August 29, 2014.   PSR at ¶ 15.   In 2011,

---

2 The Superseding Indictment changed only the date of one episode of care in Count 4.

Echavia enrolled Care Specialists in the Medicare program as a home health agency. Plea at 4; Trial Tr. at 271, 272. Echavia transferred ownership of Care Specialists to his wife, Ma Luisa, on August 29, 2014.

### B. Medicare Rules & Care Specialists' Enrollment

According to Bambi Molyneux, a medical review supervisor working for CoventBridge, a Medicare contractor, home health care services may be covered by Medicare for patients who are "homebound" and need "skilled nursing" services. *Id.* at 263-64. Home health care services may be initiated for patients (referred to as Medicare "beneficiaries") after a doctor prescribes the care. *Id.* at 266-67. After home health care is initiated, a nurse from a home health agency perform an initial assessment of the patient using what is called an OASIS form. *Id.* at 267. During an episode of care, nurses employed by the home health company visit patients to provide the prescribed services. *Id.* at 295-96. After the initial episode of care, a patient (with a doctor's order) can either be "recertif[ied]" for an additional episode of care or can be discharged. *Id.* at 265-66. Home health care is billed in "60-day increments" called "episodes" which reflect the dates of patient visits. *Id.* at 265. One notable difference between initial and later episodes of care is that Medicare pays more for the initial episode. *Id.* at 266.

Ms. Molyneux testified that for a home health company to receive payment from Medicare for services provided, it must be enrolled with Medicare. *Id.* at 268. Care Specialists was enrolled with Medicare as a home health care company since at least February 2009. Trial Tr. at 260, 270-71. Echavia, as its owner, submitted the

4

first enrollment applications in both 2009 and 2010. *Id.* at 271, 272. Thereafter, Ma Luisa submitted the applications, representing herself as its "president." *Id.* at 279. As part of each enrollment application, both Echavia and Ma Luisa were required to certify that he or she "agree[d] to abide by the Medicare laws, regulations, and program instructions that apply to this provider…" *Id.* at 283.

On November 28, 2014, two months after the transfer of Care Specialists from Echavia to his wife, Medicare formally notified Echavia that he was "being excluded from participation in any capacity in the Medicare, Medicaid, and all federal health care programs…for the minimum statutory period of five years." *Id.* at 280. This included, among other things, a prohibition against "submitting or causing claims to be submitted to federal health care programs for items or services which you provide…." *Id.* at 282. The exclusion occurred after Echavia pled guilty in the Goodwill Home Healthcare matter involving payment and receipt of illegal kickbacks received, at least in part, as payments through Care Specialists. Echavia's exclusion was known to employees at Care Specialists. For example, Reginald Onate ("Onate"), a visiting nurse at Care Specialists, testified that he learned from Echavia in fall 2014 that "he could only be my driver. He wasn't allowed to interact with the patients." *Id.* at 363.

### C. Echavia's Admitted Conduct

In his plea agreement, Echavia admitted that he and his co-conspirators submitted home health claims through Care Specialists for patients who did not qualify for care, including because they were not homebound. Plea at 3-4. He

5

admitted that Care Specialists "falsified documentation, such as nursing visit notes and OASIS forms, to make it appear that beneficiaries qualified for and received home health services, when, in fact, they did not." Plea at 4. Some of the false claims submitted included those which were not ever provided—and could not have been provided—because the patients were actually hospitalized at the time of the purported services in their homes. Plea at 4. He also admitted that he paid illegal kickbacks to patients to induce them to accept services from Care Specialists. Plea at 4-5. He also admitted to violating his Medicare exclusion at least in part "by accompanying another nurse, Reginald Onate, on nursing visits and by continuing to pay kickbacks to Medicare beneficiaries." Plea at 5.

Echavia's specific admissions were confirmed and reinforced with the factual basis included in Ma Luisa's plea and the facts developed during the Newton trial, which, as they relate to Echavia, are further detailed below.

### D. Evidence of Ma Luisa Echavia's Offenses Committed with Echavia

In her plea agreement, Ma Luisa also admitted that Care Specialists submitted claims to Medicare for patients who did not qualify for home health care services and claims for patients who could not have received care because they were in a hospital at the time. *See* Ma Luisa Echavia Plea, Docket No. 175 at 3-4. Like Echavia, she also admitted that at Care Specialists, they falsified patient documentation and paid kickbacks to keep patients enrolled. *Id.* at 4. She admitted to knowing that Echavia was excluded, which prevented him from seeing patients. *Id.* at 5.

Nevertheless, she knew that Care Specialists continued to submit claims for visits Echavia was involved in. *Id.* Further evidence of Ma Luisa's involvement in the offense is included in the Government's Sentencing Memorandum for Ma Luisa Echavia, which is scheduled to be filed July 7, 2021.

**E.    Evidence of Newton's Offenses[3] Committed with Echavia**

The evidence presented demonstrating Newton's involvement in the conspiracy is detailed in the Government's Sentencing Memorandum for Angelita Newton.[4] As it relates specifically to Echavia, Newton worked at Care Specialists directly for Echavia as a Quality Assurance employee or "QA," between 2011 and 2017. *See* GX 322R, 324R[5]; *see also* Tr. at 329, 475 (according to Fia Rivera, Newton worked "[a]s a QA and as secretary of Ferdie.").

One of Newton's tasks for Echavia was to fill out patient visit notes for visits that Echavia purportedly performed (including those who, as Echavia and Ma Luisa admitted, were actually in the hospital at the time of the supposed visit). *See* Trial Tr. at 657 (Michele Santos, an office employee at Care Specialists, testified that on a nearly daily basis, she observed Newton writing notes for Echavia); *id* at 680 (Tony

3 Other details of Newton's offenses are detailed in the PSR, the Government's Version of the Offense (attached to the PSR), and in the Superseding Indictment, dated December 19, 2019.
4 The government intended to file the sentencing memorandum for Newton on July 8, 2021, but anticipates a delayed filing schedule in light of the Court's order regarding Newton's post-trial motions and the parties' request for a new schedule. *See* Docket Nos. 231, 232.
5 The transcript from trial did not include transcriptions of each of the recording excerpts from Newton's interview. However, the evidence provided to the jury included agreed-transcripts of each excerpt. Citations to the recording are to the exhibit number for the recording excerpts which were played for the jury and were part of the evidence at trial.

Demata testified that he observed Newton "writ[ing] something on the blanks" of patient visit notes and that this was done "all the time."); *see also id.* at 362, 606-07, 679 (other employee testimony about observing patient visit notes signed by Echavia but otherwise blank on Newton's desk). In effect, Echavia pre-signed blank patient visit notes and then left them for Newton to fill in with information about the "visit."

Newton was aware that Care Specialists was routinely billing Medicare for visits that could not have happened because the patients were hospitalized at the time of the visit. In a recorded interview presented at trial, Newton stated that "many times" there were patients whose claims from Care Specialists were rejected because Medicare records for purported dates of service at Care Specialists overlapped with the patients' actual hospital stays. *See* Ex. 324R. When confronted with these overlaps, Echavia "would just smile" and said "oh, ok…I'll change it," referring to the date when Care Specialists supposedly rendered services to the patient. *See* Ex. 324R. Newton was involved in the process of creating visit notes with new non-overlapping dates of purported service to re-submit to Medicare. *See* Trial Tr. at 492 (Rivera testimony that she notified Echavia's QAs, including Newton, about overlaps and the patient files were changed).

## F.     Evidence of Onate's Offenses Committed with Echavia

In his plea agreement, Onate admitted that, through his position as a home visiting nurse, he caused the submission of claims to Medicare for patients who were not homebound and did not receive skilled nursing services. *See* Plea Agreement, Docket No. 21 at 3, *United States v. Reginald Onate*, No. 17 CR 465 (N.D. Ill. Oct. 2,

2017).   In other words, he submitted materials that caused claims to be submitted for patients who did not qualify.   Onate also admitted the he knew that Care Specialists was paying illegal kickbacks to patients.   *Id.*

At Newton's trial, Onate described his conduct.   Care Specialists was his first job after finishing nursing school.   *Id.* at 324.   After attending some brief training, Ma Luisa sent him to visit patients in their homes on his own as a visiting nurse for Care Specialists.   Trial Tr. at 333-34.   On his visits, patients sometimes specifically asked for Echavia or simply asked for their money. *Id.* at 345-48.   Onate reported this back to Newton and Ma Luisa, and soon after, Echavia started going with Onate on patient visits.   *Id.* at 352.   Onate agreed to this even though Echavia told him that "he [Echavia] could only be my driver. He wasn't allowed to interact with the patients."   *Id.* at 363.   During patient visits with Echavia, Onate testified that Echavia often went into the patient's home a few minutes before him, or stayed a few minutes after, and that he suspected this was when Echavia gave patients the cash (outside of his sight).   *Id.* at 353.   Onate testified on one occasion he actually saw Echavia give a patient cash.   *Id.* at 354.

Onate also described how he and Echavia did not actually perform proper home visits for patients, approximately ninety percent of whom Onate observed to not be homebound.   Trial Tr. at 337.   The visits were largely perfunctory, and sometimes were even performed in the car.   *Id.* at 356.   During visits in the car, "either we would go in the back and, you know, perform the vitals, what have you, you know, me being in the front seat reaching in the back or them coming—or me coming outside of

9

the care and, you know, just opening the back door." *Id.* at 357. Nevertheless, Care Specialists documented these as home health visits as if the services were home health visits performed in the home. Tr. at 357.

### G.    Patient Testimony from Trial

Several patients enrolled at Care Specialists testified during the trial about their experiences. Joseph Davis explained that he first learned of Care Specialists when someone called "Freddie" told him that "if I got involved with Care Specialists, that I would get home care provision, plus a $50 sign up bonus, something like that." *Id.* at 423. During "Freddie's" visits to Mr. Davis, Echavia had Mr. Davis sign forms and gave him $50. *Id.* at 424. The only medical services performed on Mr. Davis by "Freddie" was for his vitals to be taken. *Id.* at 425. Over the period when Care Specialists was billing Medicare for treating Mr. Davis, he said that he spent his time "cooking, cleaning, painting, [and] also enjoying a health club to get some weight off." *Id.* at 425. Mr. Davis described how he spent his time at the gym to include "treadmill, elliptical, lift weights, [and] a few other different machines I'd use...[e]very day or every other day...[for a] half hour to an hour" each time. *Id.* at 427. Mr. Davis recalled having certain visits that occurred in Ferdie's car. *Id.* at 428. When shown records of the Care Specialists' documentation of his health, Mr. Davis pointed out their many inaccuracies, for example, that he did not need someone to lay out clothing or to assist him to dress. *Id.* at 431. Mr. Davis contradicted Care Specialists' medical records which claimed that he was "unable to prepare light meals on a regular basis due to physical, cognitive, or mental limitations," he confirmed that

10

he liked to cook "beans, gumbo, greens, lasagna, baked chicken [and] jerk chicken." *Id.* at 433. For the period when Mr. Davis was enrolled at Care Specialists, Medicare paid $38,651.80. *Id.* at 688.

Michael Maiden also testified during trial about his experience as a patient at Care Specialists. Maiden testified that he first met "Freddie" sometime in 2011 in his mother's home and during that meeting, Freddie paid him "about 50 bucks." *Id.* at 437. After the first meeting, Mr. Maiden testified that he saw Freddie "twice a month" for around ten or fifteen minutes each time. *Id.* at 438. At those visits, Freddie "sometimes [] would take my blood pressure. Sometimes we would just talk and asked me had you met anybody else that was interested in care." *Id.* at 439. At each visit, Freddie paid Mr. Maiden $50. *Id.* at 439. When asked about Care Specialists' medical records for him, Mr. Maiden disagreed with several characterizations about his health. *Id.* at 441-43. In total, Medicare paid Care Specialists $18,432.96 for services purportedly provided to Mr. Maiden. *Id.* at 688.

Another patient, Melvin Meeks, also testified at trial. Mr. Meeks learned about Care Specialists through "a guy who I grew up with" who "was telling me about I'd get some money if I had a red, white, and blue card;[6] and he gave me a number go call a guy called Freddie, and I called him." *Id.* at 447. A few weeks later, Freddie "came to the store I was working at, and he talked to me about it." *Id.* at 447-48. At the time, Mr. Meeks worked at a grocery store where he was responsible

---

6 "Red, white, and blue card" is a common colloquial reference to Medicare beneficiary cards, which are red, white, and blue.

for stocking shelves and cleaning up. *Id.* at 448. During Freddie's visits, he "just wrote something on some papers, asking me if I was in pain anywhere, and I told him no; and he wrote something on the paper, and then he told me to sign the papers" and after that was concluded, Freddie gave him $50 in cash. *Id.* at 449. These visits occurred once a month, and with each visit, Freddie gave Mr. Meeks cash. *Id.* at 450.

Curtis Williams testified during the trial about the experience the he, his wife, and his stepson had with Care Specialists as "patients" there. *Id.* at 452-53. Mr. Williams testified that he first learned about Care Specialists through a friend who said, "if I had a red, white, and blue card, if I signed up with him, that he would pay me $100." *Id.* at 454. After learning about Care Specialists, Mr. Williams, and his wife, and his stepson each had a visit from Freddie. *Id.* at 455. At the meeting, Freddie paid him $100 to each of his "patients," for a total of $300. *Id.* at 456. During the visits, Freddie asked Mr. Williams to sign forms. *Id.* During the time period when Care Specialists visited him, Mr. Williams testified that he took his pet dog on long walks and was wrapping up his career working as "a maintenance employee" at a local service organization. *Id.* at 453, 458. When asked about how his health was characterized in Care Specialists' documents, he refuted many of the notes about how he was documented: he did not need help getting dressed, taking a bath, using the toilet, cooking, or other activities. *Id.* at 458. Mr. Williams confirmed that neither his wife nor son-in-law had any of those challenges. *Id.* at 459. Evidence from trial showed that Medicare paid Care Specialists $11,395.45 in

12

total for services purportedly rendered to Mr. Williams.  *Id.* at 686.  For his wife, the total Medicare paid was $32,072.46 and for his stepson, the total was $18,040.88. *Id.* 687-88.

### H.  Other Evidence of Echavia's Offenses

With respect to the in-office conduct at Care Specialists, Fia Rivera testified during Newton's trial.  Rivera worked answering phone calls and as a biller.  *Id.* at 471-72.  Rivera testified that when she reviewed Echavia's patient visit notes, "Angel's handwriting," not Echavia's, appeared in the body of between 70 or 80 percent the visit notes.  *Id.* at 479.  Rivera testified that during the period when she was answering phones at Care Specialists, she often took calls from patients where they "were looking for Ferdie, and sometimes they were asking for money."  *Id.* at 484.  She forwarded such calls to "Angel or Ma Lu."  *Id.* at 484.

## IV.  Sentencing Guidelines Calculations

The government agrees with the Guidelines calculations in the PSR.  The government does not believe that there are any factual inaccuracies in the PSR.

The PSR calculated that the total offense level is 30.  PSR at ¶ 45.  With an offense level of 30 and criminal history category of II, the PSR calculates Echavia's Guideline range is 108-135 months' imprisonment.  PSR at ¶ 99.

## V.  Section 3553(a) Factors Warrant a Significant Sentence

The November 2018 Sentencing Guidelines Manual is applicable in this case.

### A.  History and Characteristics of the Defendant

The defendant is a 47-year old man.  He was born in the Philippines, came to

the United States in 2005, and became a naturalized citizen on February 8, 2011. PSR ¶ 60. He married Ma Luisa in 1993 when they both still lived in the Philippines. PSR ¶ 62. They have one child who is 24 years old. *Id.* According to the PSR, he does not have any significant health or addiction issues. PSR ¶ 70-73.

As is relevant to the Court's consideration of the appropriate sentence, Echavia's history and characteristics include committing the instant crime while he was still on probation for an earlier offense which also involved payments of illegal kickbacks. PSR ¶ 51. In fact, some of the illegal kickbacks in Goodwill were funneled through Care Specialists to get to Echavia. *See United States v. Goodwill*, Sentencing Hearing Transcript, Docket No. 216 at 23; PSR ¶ 49. At his sentencing hearing, Echavia came into court, took an oath to be truthful, and told the Court that he would not ever commit a crime again. Not only was that not true, Echavia knew it was not true *at the time* he said it. Importantly, when Echavia pled guilty to paying and receiving kickbacks in connection with the Goodwill matter, he was not sentenced to any time in custody.[7] Rather, he was sentenced to three years of probation including six months of home detention. *See* PSR ¶ 49. He took advantage of this freedom to commit more crimes.

Separate from his other criminal case in this District, there is evidence that Echavia was involved in illegal conduct to obtain patient referrals even before his

---

7 According to the sentencing hearing transcript, Echavia's offense level was 13, criminal history category was 1, resulting in an advisory guideline range of 12 to 18 months. *See* Docket No. 216 at 23.

time at Care Specialists or Goodwill Home Health.[8]    In September 2007, the Illinois Department of Financial and Professional Regulation ("IDFPR"), a state agency which regulates nursing licenses (among other things), disciplined Echavia.   The "reason for action" identified was that Echavia "accessed a patient's telephone number" from the hospital where he was working at the time "to use for a home care referral."   *See* Exhibit 1 to Government's Version of the Offense.   The IDFPR disciplinary action appears to have followed a complaint filed by the Chief Nursing Officer of the hospital employing Echavia.   In an interview with the FBI on December 12, 2006, the Chief Nursing Officer explained that Echavia admitted receiving $400 per patient referral that he provided to a separate home health care agency in the Chicago area. According to the hospital executive, Echavia admitted that he would access hospital records to look up patients' discharge dates, diagnoses, age and insurance coverage, with a focus on patients covered by Medicare and Medicaid.   He further admitted that he would then visit select discharged patients in their homes and tell them that they needed home health care.

These events—one regulatory reprimand and two guilty pleas—demonstrate that Echavia has little if any respect for the law.   He has repeatedly acted in a way that he knows to be illegal, purely to make more money for himself.   This weighs

---

[8] It is appropriate "for the court to take into consideration statements from an individual or group that was not named a victim of the charged offense.   *See United States v. Salutric*, 775 F.3d 948, 951-52 (7th Cir. 2015) ("Uncharged criminal acts (and the injuries inflicted upon the victims of those acts) have a bearing on whether the offense of conviction was an aberration or part of a larger pattern of criminal behavior, the likelihood of the defendant re-offending, and the need for specific deterrence").

heavily in favor of a more significant sentence. *See e.g.*, *United States v. Adriatico-Fernandez*, 498 Fed. Appx. 596, 600 (7th Cir. Dec. 13, 2012) (finding it "reasonable" for court to consider the defendant's "past disrespect for the law" in determining sentence).

## B.     The Nature and Circumstances of the Offenses

The offense here—conspiracy to commit health care fraud and wire fraud—is a serious one.   Health care fraud is an offense which takes advantage of the federal government, a large a bureaucratic entity vulnerable to these sorts of exploits. Medicare, in particular, has been designed by the United States' Government Accountability office as a "high risk program...in part because its size, scope and complexity make it particularly vulnerable to fraud and abuse." *See* Health Care Fraud, 56 Am. Crim. L. R. 1033, 1036 (Summer 2019).   This risk is recognized as especially high in home health care companies which have a "lack of investigatory measures at the claims-submission level" resulting in a system which is "not asleep on guard duty—rather, they have failed to even show up."   Brooke Benzio, Fee for Disservice: Medicare Fraud in the Home Healthcare Industry, 19 AHTHL 229, 231 (2010).   Because these offenses are so difficult to detect, in cases where they are identified, it is that much more important to respond to them as serious offenses.

Far from being an isolated incident, Echavia's conduct spans the entire period of the conspiracy, from at least March 2011 through July 2017.   The offense only ended when the defendants were arrested.   As was demonstrated through evidence from Newton's trial, Echavia recruited people to participate in the crimes, and to

16

pressure his conspirators deeper into committing crimes with him. For example, Echavia directed Newton to fill out the patient visit notes for him, and when confronted at a company-wide meeting, just said "she's my secretary…and I will be held liable for that." Trial Tr. at 617. Ma Luisa participated in the conspiracy with full knowledge from the beginning, but it was only after Echavia was excluded from Medicare that she took on the role of "president" of Care Specialists in the company's Medicare enrollment applications, deepening the extent of her involvement. When he took Onate out to visit patients, it was Echavia who led the pair to perform visits in the *car*. As Onate described in his trial testimony about these car-visits, "either we would go in the back and, you know, perform the vitals, what have you, you know, me being in the front seat reaching in the back or them coming—or me coming outside of the car and, you know, just opening the back door." Tr. at 357. Critically, as each of the patients who testified at trial explained, it was Echavia who recruited them and paid them (all of which was happening after he was excluded). As a trained nurse, Echavia knew that Medicare was paying Care Specialists for services which, as a nurse, he knew were not needed. Taken together, all of this weighs heavily towards a greater sentence.

### C. Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote a Respect for the Law, and Provide Just Punishment for the Offense

A significant sentence of imprisonment is necessary to reflect the seriousness of the health care and wire fraud conspiracy. Imposition of a serious sentence of confinement promotes respect for the laws protecting federal health care benefit

programs and shows that abuses of the program are not taken lightly. *See e.g.*, *United States v. Kulhman*, 711 F.3d 1321, 1328 (11th Cir. 2013) ("deterrence is an important factor in the sentencing calculus because health care fraud is so rampant that government lacks the resources to reach it all."). As the Eleventh Circuit has explained, "when the government obtains a conviction in a health care fraud prosecution, one of the primary objectives of the sentence is to send a message to other health care providers that billing fraud is a serious crime that carries with it a correspondingly serious punishment."). This is especially true where Echavia's crimes were calculated and continued over many years.

Failing to impose a significant punishment for health care fraud offenses risks eroding confidence in the overall judicial system. *See United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018) (quoting Justice Breyer's article about his role on the United States Sentencing Commission as explaining "that 'to avoid unfair anomalies' among thousands of examined cases, the Commission 'increased certain white collar sentences when necessary to avoid disparity between white collar and blue collar crime'"); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (stating the importance of the "deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail."). Lower sentences for fraud-based offenses also encourage an "everyone is doing it" mentality which serves only to encourage these sorts of "white-collar" offenses. *See United States v. Saleh*, 257 F. App'x 740, 745 (5th Cir. 2007) (stating

that a district court's substantial downward variance "could be seen as expressing a special, lenient sentencing regime for white collar criminals"). It is inappropriate, then, to treat health care fraud as a non-serious crime, especially for someone like Echavia who was educated and trained to know better.

### D. Need to Afford Adequate Deterrence

In this case, there is a significant need for both specific and general deterrence. On specific deterrence, Echavia committed the instant offense "while under a criminal justice sentence for conspiracy to solicit and receive remuneration for patient referrals." PSR ¶ 51. This was after an earlier reprimand by IDFPR for selling patient information as referrals. *See* Gov't Version Exh. 1-2. Neither the state's administrative penalty, nor his involvement in the federal criminal justice system previously have had any impact on his willingness to pay illegal kickbacks for patient referrals. Though not necessarily a result of his non-custodial sentence after his plea in the Goodwill case,[9] it certainly weighs against ordering a non-custodial or even a short custodial sentence here.

A significant sentence also serves an important purpose for general deterrence. Health care fraud offenders are "prime candidates for general deterrence." *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (discussing sentences for health

---

[9] As part of the order of judgment in the Goodwill matter, Echavia was ordered to pay $84,509 as forfeiture. *See* Judgment, 12 CR 622, Docket No. 206. Based on information obtained from current defense counsel it appears that in October 2014, the U.S. Marshals Service agreed to accept installment payments of $800 per month toward the judgment; this was reduced to $450 per month in February 2015. The current balance is unknown.

care fraud conspiracy defendants).   As *Brown* noted, "the district court was entitled to conclude that, given that health-care fraud is widespread and therefore there is a lower likelihood of getting caught, a serious penalty was necessary to ensure deterrence."   880 F.3d at 405; *see also United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence" (internal quotation marks omitted)).

Imposing a significant sentence for Echavia sends a strong deterrence message to him about the importance of actually following the law, and also to those who might consider joining in or helping others to commit a crime.

### E.     Unwanted Sentencing Disparities

Four individuals face sentencing for their involvement with Care Specialists. The sequencing is as follows:

| Defendant | Sentencing Date | Guidelines |
|---|---|---|
| Ferdinand Echavia | July 19, 2021 | 108-135 months |
| Ma Luisa Echavia | July 20, 2021 | 78-97 months |
| Angelita Newton | July 21, 2021 | 108-135 months |
| Reginald Onate | July 30, 2021 | 37-46 months |

For the reasons explained above, and in the government's other Sentencing Memoranda, the government submits that Echavia is the most culpable of all of the defendants involved.   He initiated and led the criminal conspiracy that expanded in

size and scope as a result of his conduct. He was responsible for recruiting patients, and fabricating the sale to his wife to conceal ownership. It was he who continued to act even after Medicare excluded him from being involved in patient visits. It was he who pre-signed blank forms purporting to be patient visits which he knew would be used to submit bills to Medicare for visits that he never actually performed. All of this took place with his full knowledge of the illegality of their conduct, given his prior charges and plea. While the others participated and provided absolutely necessary contributions to the conspiracy, it would not have happened but for Echavia.

## VI.  Restitution

Restitution is mandatory in this case. 18 U.S.C. § 3663A(c)(1)(B). The government agrees with the PSR that the defendant is obligated to pay $6,332,936 of restitution to Medicare. PSR ¶ 111. The restitution obligation is joint and several with Echavia's co-defendants, Ma Luisa Echavia, Newton, and Onate. *See Id.*; ¶ 2. The PSR concluded that Echavia is able to make a lump-sum payment towards restitution and that he may be able to continue making payments during the period of imprisonment. PSR ¶ 97.

## VII.  Conclusion

For all the foregoing reasons, the government seeks a within-Guidelines sentence for Echavia of 108 months.

JOSEPH BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By: *Leslie S. Garthwaite*
    Leslie S. Garthwaite
    Trial Attorney
    219 South Dearborn St., Rm. 500
    Chicago, Illinois 60604
    (202) 631-6388

Dated:   July 6, 2021

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Trial Attorney hereby certifies that the following document:

GOVERNMENT'S SENTENCING MEMORANDUM

was served on July 6, 2021, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s <i>Leslie S. Garthwaite</i>
LESLIE S. GARTHWAITE
Trial Attorney, Department of Justice
219 South Dearborn Street
Chicago, Illinois
(202) 631-6388
