## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>FERDINAND ECHAVIA,<br>Defendant. | No. 17-CR-455-1<br><br>Honorable Virginia M. Kendall |

## DEFENDANT FERDINAND ECHAVIA'S POSITION PAPER AS TO SENTENCING FACTORS

Defendant Mr. Ferdinand Echavia ("Mr. Echavia"), by and through his attorneys, Pravin Rao, Jon Buck, and Margaret Smilowitz, submits this Sentencing Memorandum pursuant to 18 U.S.C. § 3553 and Local Criminal Rule 32.1(g), in advance of his sentencing hearing, currently scheduled for July 19, 2021 at 12:30 p.m. This Memorandum apprises the Court of Mr. Echavia's background and involvement in the offense alleged by the Government and offers information relating to sentencing factors in this case.

## I. INTRODUCTION

Mr. Echavia is a 47-year-old father, husband, brother, son, and friend to many. Over 16 years ago, trying to provide a better life for his young family, Mr. Echavia moved his wife and son from their island province in the Philippines to the United States and settled in Chicago. He studied hard to earn his registered nurse credentials, worked in several hospitals and nursing homes, and eventually opened his own home health care company, Care Specialists, Inc. ("Care Specialists").

Mr. Echavia acknowledges that he made poor choices in this pursuit of a better life. Indeed, as he admitted in his Plea Agreement and before this Court, Mr. Echavia and others at Care Specialists conspired to defraud the Medicare program by causing the submission of Medicare claims on behalf of beneficiaries who in many instances did not qualify for reimbursement and for home health services which in many cases were not actually provided. Mr. Echavia and his co-conspirators also worked to falsify documentation in support of the Care Specialists' submission of Medicare claims. On occasion, Mr. Echavia also paid kickbacks and bribes to Medicare beneficiaries to induce them to accept Care Specialists' home health services. Mr. Echavia also was involved in these actions, albeit at times indirectly, while subject to a Medicare program exclusion.

Mr. Echavia's poor judgment and decisions have already had dramatic repercussions on his family's life as well as his own. In the wake of the resulting criminal charges, Mr. Echavia lost his business, wrecked his (and by extension, his family's) livelihood, and he faces overwhelming guilt, stress, and embarrassment day in and day out.

Since his arrest and the closing of Care Specialists, however, Mr. Echavia has been working diligently in an effort to get his life back on track, starting with taking full responsibility for his conduct and pleading guilty in open court. Mr. Echavia has also made admirable efforts to give back to the community he hurt by devoting many hours volunteering over the last year to the American Red Cross as part of the organization's COVID-19 response.

- 2 -

This is a case where a sentence between 36 and 48 months is consistent with comparable cases and appropriate under the Advisory Sentencing Guidelines and 18 U.S.C. § 3553 for the following reasons.

### A. Mr. Echavia has demonstrated a complete acceptance of his wrongdoing.

On January 28, 2020, Mr. Echavia pled guilty to one count of conspiracy to commit health care and wire fraud in open court. He readily admitted his criminal conduct and understands that he must serve time in prison as the just consequence of his actions. Moreover, committed to making things right, Mr. Echavia understands his obligation to make the government whole and pay restitution in this matter post-release.

### B. Mr. Echavia already has the tools to get his life back on track and contribute to society upon release.

Mr. Echavia is highly-educated, and as a registered nurse, has undergone extensive and specialized health care training. While Mr. Echavia will be barred from working in a health care position that involves Medicare-billed services, he is determined to put his medical skills to good use by seeking other caregiving and volunteer opportunities post-release.[1] Mr. Echavia has even started this endeavor while on pretrial release. From late 2018 through March 2020, when the position

---

[1] Mr. Echavia's skilled nursing and home caregiving training will be in increasingly high demand post-release. The U.S. population is aging rapidly. A 2016 study conducted by the U.S. Department of Health and Human Services found that more than half of the 10,000 baby boomers that turn 65 years old *every day* will eventually need some form of long-term care. Robert Channick, *'Crisis mode': As boomers age, a shortage of caregivers*, CHICAGO TRIBUNE (Dec. 10, 2017), *available at* https://www.chicagotribune.com/business/ct-biz-caregivers-demand-aging-20171116-story.html (internal citations omitted). Experts say that demand for personal caregivers is already outstripping supply. *Id.*

was eliminated because of COVID safety, Mr. Echavia worked as a home caregiver for Carl and Michelle Shapiro. The attached character letter from Mrs. Shapiro shows just how much Mr. Echavia was valued in the Shapiro home.

Mr. Echavia's desire to care is not just connected with his need to earn a living—he is a dedicated community supporter. Realizing that his medical training could be an especially critical resource during a pandemic, Mr. Echavia enrolled as an American Red Cross volunteer at the height of Illinois's COVID-19 outbreak. Mr. Echavia completed his Red Cross training courses in May 2020 and has since been working as a hotline response deployment operator, where he advocates for victims of natural disasters by helping them secure housing, medicine, and other necessities. *See* Group Exhibits A and B.

On top of this, Mr. Echavia has been working many hours a week delivering groceries through Instacart and is also developing mobile apps for the Apple store. As this demonstrates, even in the face of incarceration, Mr. Echavia strives to help his family and his community. Upon release, he has the skills and the drive to turn his life around and give back to the community.

**C.  A sentence below the low end of the applicable Guidelines range would be consistent with sentences imposed on similarly-situated defendants.**

Defendants convicted of similar participation in health care fraud schemes and exhibiting comparable personal circumstances to Mr. Echavia's have received sentences far below the low end of their applicable Guidelines ranges. Additional

analysis on comparable cases is provided in Section C at page 20. A lengthy sentence here would not be consistent with § 3553(a)(6).

### D. Under the circumstances, anything but a below-Guidelines sentence would be greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).

The applicable Guidelines range (108 to 135 months) is based largely on the Government's proffered loss amount of $6.3 million, which, as discussed further below, is calculated based primarily on the testimony of Mr. Echavia's co-conspirator, Reginald Onate. *See* Gov't Version of the Offense at 3, DKT. No 200 (citing Testimony of Reginald Onate, Tr. 337:14-20)). Pursuant to § 2B1.1(b)(1)(J), Mr. Echavia's sentence is enhanced by *18 points* because the Government's loss amount is above $3.5 Million. Though technically appropriate within the framework of the Guidelines, the applicable Guidelines range is greater than necessary to satisfy the purposes of § 3553. Mr. Echavia has already suffered greatly for his wrongs: Mr. Echavia has lost his business, suffered irreversible damage to his reputation (for years, Mr. Echavia was too ashamed to tell his parents about the charges and only informed them recently), and he has come to terms with the fact that he will be serving time in prison, separated from his family and friends.

All of these losses, to be borne by Mr. Echavia, are the result of a fraud that did not result in the type of lasting direct personal gain that usually accompanies the vast majority of fraud cases. Indeed, Mr. Echavia's financial disclosures clearly exhibit a negative net worth, and he has lost his home to foreclosure. Under these

circumstances, a sentence between 36 and 48 months would be in line with the comparable cases detailed further *infra* Part II.C and not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).

## II.   SENTENCING STANDARD AND GUIDELINES

### A. Sentencing Standard

A reasonable sentence in a criminal case is determined first by calculating the sentence range as enumerated in the advisory United States Sentencing Guidelines (the "Guidelines"); and second by incorporating the relevant sentencing factors as set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007), citing *United States v. Dean*, 414 F.3d 725, 727 (7th Cir. 2005). A sentencing judge must conduct this two-step analysis to ensure a reasonable sentence is imposed. *Id*.

In determining an appropriate sentence, the Court is required to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The overarching principle in sentencing, as set forth in § 3553, is that the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the [sentencing purposes] set forth in [3553(a)(2)]." (emphasis added).

Those purposes include:

(2)  the need for the sentence imposed—

    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)  to afford adequate deterrence to criminal conduct;

    (C)  to protect the public from further crimes of the defendant; and

    (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  In addition to these guiding principles, however, courts are also required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

A sentencing court may not presume that the advisory Guidelines range is reasonable.  *Gall*, 552 U.S. at 50.  Indeed, a court need not accept the Sentencing Commission's penological framework at all and, instead, may adopt its own.  *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2008).  Under post-*Booker* case law, the sentencing judge has wide discretion to analyze and weigh the circumstances of the offense and character of the offender in the sentencing decision.  *United States v. Carter*, 538 F.3d 784, 794 (7th Cir. 2008) (deferring to district court's downward departure based on the "articulated reasons for variance from the advisory guidelines").  In determining an appropriate sentence, a court must make an individualized assessment based on the facts presented.  *Id*.  The Supreme Court has emphasized that having "the fullest possible information concerning the

defendant's life and characteristics" is "highly relevant – if not essential" to the sentencing process. *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (internal quotation marks and citation omitted). "Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant." *Id.* (internal quotation marks and citation omitted).

**B. Sentencing Guidelines Calculation**

Each sentencing decision must begin by consulting the applicable advisory Guidelines. Probation has determined that Mr. Echavia has a total offense level of 30 and a criminal history category of II, which corresponds to a range of 108 to 135 months under the Guidelines.

The Plea Agreement reserved Mr. Echavia's right to "present evidence and argument" on the issue of loss amount, as it was Mr. Echavia's position that the actual loss amount was greater than $1.5 million but not more than $3.5 million. Plea Agreement, Dkt. 173, *United States v. Ferdinand Echavia*, 17-cr-455-1, at 7 (N.D. Ill. Jan. 28, 2020). Upon further consideration of the directives and comments associated with the Guidelines, Mr. Echavia is not formally contesting the Government and Probation's calculation of loss amount at $6.3 million at this sentencing phase. More specifically, Mr. Echavia acknowledges that for federal health care offenses involving Government health care programs, under the Guidelines "the aggregate dollar amount of fraudulent bills submitted to the

Government health care program shall constitute prima facie evidence of the amount of the intended loss." U.S.S.G. § 2B1.1(b)(1) cmt. 3(F)(viii).

Here, the Government determines the applicable loss amount based on Mr. Onate's testimony at the trial of Mr. Echavia's other co-conspirator, Angelita Newton, that a "ballpark" estimate was that 90% of the care provided by Mr. Echavia's company, Care Specialists, was to patients that were not confined to their homes. (Testimony of Reginald Onate, Tr. 337:14-20) (the relevant portion of Mr. Onate's testimony is attached to this memo as Exhibit C). Relying on this estimate, the Government concludes that the loss amount is $6.3 million, equal to 90 percent of the $7,036,595 that Medicare paid Care Specialist from 2011 to 2017 because patients who can leave their homes do not qualify for Medicare reimbursement. By comparison, if instead, Mr. Onate's "ballpark" estimate was that 50% of the care was to patients who were not truly confined to their homes, Mr. Echavia's guideline range, all else equal, would be only 87 - 108 months (based on an offense level of 16). And this reduced range is still considerably above the average sentence for an economic crime of 23 months. *See* UNITED STATES SENTENCING COMMISSION REPORT ON ECONOMIC CRIME, January 30, 2019 at 2.[2]

Because Mr. Echavia is committed to communicating his deep remorse to the Court, he has no desire to get into a protracted dispute with the Government regarding the profits of his scheme. However, consistent with case law and current scholarship on the issue, we respectfully suggest that the Government's loss

---

[2] Report available at https://www.ussc.gov/research/research-reports/what-does-federal-economic-crime-really-look-like

calculation may exaggerate the Guidelines range in a way that does not accurately reflect his misconduct or personal benefit in the way the Guidelines were designed, resulting in an inappropriate loss amount inflation. *See e.g.*, *United States v. Faibish*, No. 12-CR-265 ENV, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) ("[S]trict application" of the Guidelines derived from the loss table can "unfairly balloon [a defendant's] sentencing range beyond any reasonable proportion to his crimes.") and ("[t]he loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime".); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. Aug. 4, 2004) ("But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes—to assign precise weights to the theft of different dollar amounts. In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."); Derick R. Vollrath, *Losing The Loss Calculation: Toward A More Just Sentencing Regime In White-Collar Criminal Cases*, 59 DUKE L.J. 1001, 1020 (2009) ("The sentencing of federal white-collar criminal defendants is deeply flawed. The guidelines recommend sentences that are generally too harsh. Moreover, the guidelines place undue emphasis on the loss calculation, an imprecise measure that fails to accurately correlate with the defendant's culpability.").

The scheme that Mr. Echavia was part of was serious in that it involved exaggerating the medical needs of patients for profit at the government's expense but, critically, this scheme did not cause any physical or financial harm to patients. Mr. Echavia did not, as is the case in many fraud cases, attempt to swindle individual victims out of their money. Instead, he took advantage of a loophole in the Government's system in order to take himself and his family out of poverty. It was wrong, and he knows it, but 108 -135 months is disproportionate to this conduct. Accordingly, an additional downward variance would be appropriate in Mr. Echavia's sentencing.

Based on a host of mitigating factors, including loss amount inflation and the 18 U.S.C. § 3553 analysis detailed below, Mr. Echavia respectfully requests that this Court issue a sentence below the low end of the Guidelines range.

## II.    ANALYSIS OF § 3553(a) FACTORS

### A.    Mr. Echavia's History and Characteristics

#### 1.    *A Filipino Upbringing*

Mr. Echavia was born on March 16, 1973 in Calape, Philippines, to the marital union of Demetrio and Leandra Echavia, both Filipino citizens. Mr. Echavia was the eldest of two, with his sister, Doris, two years his junior.

Mr. Echavia's parents were both teachers and worked hard to provide for their family. When Mr. Echavia was a young boy, his mother left the family to work as a teacher in Hong Kong for several years. His mother, Leandra, would send her earnings home to make sure that Mr. Echavia and his sister had enough to eat and

all the clothes and supplies they needed for school. It is worth noting that pursuing economic opportunities abroad and sending earnings to family members back home, also known as serving as an Overseas Filipino Worker ("OFW"), is a prevalent and honored practice in Filipino culture. Both Mr. Echavia and his sister would follow in their mother's footsteps as future OFWs—Mr. Echavia to Saudi Arabia and then to the United States, and Doris to Australia.

Mr. Echavia dreamed of becoming a nurse from a young age. He worked hard to make that dream a reality, focusing on his studies throughout grade school and high school and even earning the title of high school class valedictorian in 1989.

Apart from his schoolwork, Mr. Echavia also devoted significant time to community service during his teenage years. Grace Villacarlos Fernandez, a childhood friend and former classmate, and Clarissa Galang Baluma, a cousin, both submitted character references that detailed Mr. Echavia's work as their "barangay" (or village ward) Youth Council Chairman. *See* Exhibits D and E. Ms. Fernandez explained that Mr. Echavia "became a youth leader in our barangay. During his time of service, he was very responsible and honest. [... He] was a good leader to us and a role model to the youth." Ex. D. Ms. Baluma wrote that "[a]s chairman, [Mr. Echavia] had shown very good leadership to the youth having them generally united, participative and cooperative in all his development projects, programs and activities to uplift the welfare of the youth especially in the field of sports." Ex. E. Indeed, Mr. Echavia would often organize soccer games and

basketball tournaments to provide a safe space and a fun outlet for children in the community.

Having excelled academically in high school, Mr. Echavia was accepted into the nursing program at Divine Word College. Again, Mr. Echavia focused on his studies, worked hard, and within four years, graduated with a Bachelor of Science in Nursing degree.

### 2. *Pursuit of a Better Life and Emigration to the United States*

Soon after completing his schooling, Mr. Echavia married his now-wife, Ma Luisa Echavia, and their son, Kurt Echavia was born. In 1996, still a young man himself, Mr. Echavia made the difficult decision to pursue a well-paying medic position in Saudi Arabia. As hard as it was to leave his family, he knew his ability to provide for them improved by working abroad. His son, Kurt, remembers the time Mr. Echavia was away and wrote the following expressing his gratitude for his father's sacrifice:

> I still remember it as if it were yesterday, when my father became an overseas worker (OFW) and worked as a nurse in Saudi Arabia. As a child, I didn't understand that leaving my family and I behind in the Philippines was a sacrifice that my father had to endure in order to make our life better but as I grew older, I have come to deeply appreciate all his efforts and perseverance. Being far away in a whole different country didn't discourage my father from taking care of us. He would often communicate with us through phone calls and he would always send things via balikbayan boxes for my family, because he knew it would put a smile on our faces.

Ex. F. Monette Guden-Cua, Mr. Echavia's sister-in-law also remembers his dedication and fierce drive to provide for his young family. *See* Exhibit G. She writes: "[a]t first, they were in struggle as they married early. But in the long run, I

was able to realize how sturdy they were, especially [Mr. Echavia].  I saw the inspiration my sister and their son, Kurt gave to him.  He transformed into a brilliantly determined head of the family when he went to Saudi Arabia."  Ex. G.

In Saudi Arabia, Mr. Echavia worked as a medic at the Ghazlan Power Plant for two years and then took a position as a triage nurse at a military hospital for another six years.  Most of Mr. Echavia's military hospital patients were soldiers who had been severely injured.  For example, Mr. Echavia vividly remembers being the first responder to a plane crash and attempting to provide emergency care to the two pilots.  To this day, he experiences flashbacks of his patients at the Saudi Arabian hospital.

In 2003, after spending eight years away from his family, Mr. Echavia, Ma Luisa, and Kurt were reunited in the Philippines, and from there, moved across the world to start a (at the time, hopefully) brighter life in the United States together. Kurt described the family's transition to the United States as follows:

> Moving to the United States was a turning point in all our lives because my father's sheer determination paid off and we were finally reunited together.  The first few years living in Chicago was tough on my family because we had to adapt and assimilate to a whole new culture and had no source of income.  Despite it all, my father became our pillar of strength and I remember how he always remained positive even if he was still in the midst of studying for the NCLEX exam to become a registered nurse.

Ex. F.  Indeed, upon arriving in Chicago, Mr. Echavia concentrated on his studies once again.  Mr. Echavia passed his licensing exam on the first try, earned his registered nurse credentials, and had the means to start providing for his family in the United States.  *See* Ex. F ("When my father officially became a registered nurse

- 14 -

of Illinois, we were overcome with joy and gratitude because he had reached one of his dreams. Seeing the passion that my father had for working as a nurse [...] influenced me to choose the same career path as him, becoming an aspiring member of healthcare.").[3] Mr. Echavia would go on to work in several hospitals and nursing homes. He eventually opened Care Specialists, his own home health care company.

### 3. Making Up for Past Wrongs and Getting Back on Track

Mr. Echavia has readily admitted, both in his Plea Agreement and in open court, that his medical support efforts took a bad turn. He and his Care Specialists co-conspirators defrauded the Medicare program. Mr. Echavia has accepted responsibility for his criminal conduct and has come to terms with the fact that he will serve time in prison as a consequence of his regrettable actions.

Before that time comes, though, Mr. Echavia has endeavored to start making up for past transgressions and giving back to the community he harmed. During the first year of his pretrial release, Mr. Echavia made sure to be gainfully employed, earning money driving for Uber and Lyft. He extended his hours by driving into the night (after getting this Court's approval to do so).

Mr. Echavia then had an opportunity to work another job, working night shifts as a home caregiver for the Shapiro family. Mr. Echavia helped care for Carl Shapiro, who was recovering from a fall and suffered from severe hallucinations. In November of 2019, when Carl passed away, Mr. Echavia stayed on to care for Michelle Shapiro, who was not only grieving the death of her husband but also

---

[3] Additional character letters from Mr. Echavia's family and friends are attached as Exhibit H.

suffered from a fall herself. Michelle sent a letter to Mr. Echavia and his wife, thanking them for their work. *See* Exhibit I. She wrote, "[t]hank you so much for all your hard work, caring, kindness and all the help. You are both wonderful people and your excellence in caregiving is the best. You made this difficult year so much better with your smiles and knowledge. Carl and I were truly blessed to have you both care for us." Ex. I.[4]

In light of the risk of exposing Michelle to coronavirus, Mr. Echavia stopped working for the Shapiro family in early March 2020. But as Illinois cases started to surge, Mr. Echavia realized that his health care background could be especially valuable and affirmatively sought out opportunities for volunteers with medical training. Mr. Echavia enrolled as an American Red Cross volunteer at the height of Illinois's outbreak. In May 2020, he completed his Red Cross training courses and was awarded a Red Cross Training Services Certification of Completion (for Adult, Child, and Baby First Aid/CPR/AED). *See* Group Exhibit A. Over the last year, Mr. Echavia has volunteered to work several on-call shifts as a hotline response deployment operator. *See* Group Exhibit B. In this role, Mr. Echavia helps victims of natural disasters, most recently a victim of a fire, navigate the intricacies of the healthcare system during COVID.

Notably, when he is not volunteering, Mr. Echavia is out delivering groceries through Instacart, trying to earn a living for his family, though his income is

---

[4] Additional character letters submitted by Mr. Echavia's past patients and their family members are attached as Exhibit J.

entirely dependent in demand, Mr. Echavia can earn more than $900 a week doing this. *See* Group Exhibit K.

Given the limits on his ability to find gainful employment because of his conviction and the pandemic, recent periods have been especially hard for Mr. Echavia and his family. His wife is completely out of work, his son is in a nursing school in the Philippines and not bringing in income, and it has been difficult to find a job providing in-home care because of COVID safety. The financial disclosures submitted to Probation show, not surprisingly, that Mr. Echavia has a negative net worth. The family home, which was already subject to foreclosure proceedings, recently had the gas shut off as a result of unpaid bills. The only reason Mr. Echavia continues to have a roof over his head is because of the moratorium on evictions.

Mr. Echavia's current financial status is a far cry from most fraud defendants in the Guidelines range applicable in this case. Mr. Echavia does not have yachts, summer homes, or fancy cars. He is approaching sentencing on the edge of nothing, but yet thinking about how he can provide support with his specialized skills.

In reviewing the timeline of Mr. Echavia's life, one thing is clear—he is a provider. Following in his mother's footsteps, Mr. Echavia made great sacrifices, including being separated from his son during the better part of his childhood, to make sure his family was well-supported. Yes, Mr. Echavia acknowledges that he would go on to make bad decisions in the pursuit of providing for his family. But his roots, intentions, and recent good works should not go unacknowledged. Mr.

Echavia respectfully requests that the Court consider these factors and his history in mitigation at sentencing.

### B. Lengthy Sentence Has a Limited Deterrent Effect.

It is clear from his expressions of sincere regret that specific deterrence is not required in Mr. Echavia's case. *See* 18 U.S.C. § 3553(a)(2)(B). As discussed above, Mr. Echavia has already lost everything—his business, his friends, his reputation—and he knows he is facing years in prison. Everything he has worked so hard for in his life has vanished because of the mistakes he made trying to lift his family out of poverty. These losses alone will deter Mr. Echavia from future criminal behavior.

What's more, it bears noting that defendants with Mr. Echavia's profile are statistically unlikely to recidivate. According to a 2004 study conducted by the United States Sentencing Commission, 75.9% of all male offenders with a criminal history category of II, like Mr. Echavia, do not recidivate. *See* U.S. SENTENCING COMM'N, UNITED STATES SENTENCING COMMISSION MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES, at 28-29 (May 2004).[5] Moreover, for all category II defendants convicted of fraud, 73.7% do not recidivate. *Id*. at 30. And, of all category II offenders between the ages of 41 and 50 at sentencing (Mr. Echavia's age range), the overwhelming majority, approximately 87%, recidivate. *Id*. at 28. Indeed, Mr. Echavia's age is an important, if not the most important, factor in his deterrence evaluation. *See*

---

[5] Available at:
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

*United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) (vacating sentence and remanding because the lower court did not consider the effect of the defendant's advanced age on the likelihood of recidivism); *see also Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release, because recidivism drops substantially with age); Jeffery T. Ulmer and Darrell Steffensmeier, *The Age and Crime Relationship: Social Variation, Social Explanations in The Nurture versus Biosocial Debate in Criminology* 378 (K. Beaver, B. Boutwell, and J.C. Barnes, eds., 2014) ("It is now a truism that age is one of the strongest factors associated with criminal behavior.").

Based on the severe pain and suffering both he and his family have already experienced due to this case the past three years, Mr. Echavia's recent efforts to turn his life around, his relatively advanced age, and his educational and employment history, the chances that Mr. Echavia will recidivate upon release are exceptionally low, and the specific deterrent effect of a lengthy sentence will be limited in his case. *See* § 3553(a)(2)(C).

In terms of general deterrence, while prison sentences certainly send a message, a long prison sentence here has the potential to send the *wrong* message. Sentencing Mr. Echavia to anything but a below the low end of the applicable Guidelines range is likely to discourage defendants like Mr. Echavia from admitting guilt and taking responsibility. Mr. Echavia has made efforts to accept responsibility, turn his life around, and prepare for life after an acknowledged

period of incarceration. A punitive, burdensome sentence adds nothing further to any deterrence goals.

In short, a lengthy sentence would have a limited general deterrent effect and an even more limited specific deterrent effect.

**C.  Sentence Should be Consistent with Precedent.**

Under 18 U.S.C. § 3553(a)(6), this Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In surveying numerous health care fraud cases, both in the Northern District of Illinois and elsewhere, it is clear that district courts regularly award below-Guidelines sentences to leader/organizers and manager/supervisors of health care fraud schemes that also exhibit mitigating characteristics similar to Mr. Echavia's. These courts have deemed below-Guidelines sentences sufficient to meet the purposes and goals set forth in § 3553. In light of the examples set forth below, Mr. Echavia respectfully submits that a sentence below the low end of the applicable Guidelines range is similarly appropriate here.

***United States v. Dennys Hernandez*, No. 18-cr-20524 (S.D. Fla. May 20, 2019).**

The recent *Hernandez* case out of the Southern District of Florida presents a similar fact pattern and a nearly identical defendant profile. Like Mr. Echavia, Hernandez was 47-years old at the time of his sentencing and a United States naturalized citizen who had emigrated from Cuba. He was a co-owner of Medsel Home Health Care Corp., a purported home health care agency located in Miami,

Florida. Like Mr. Echavia, Hernandez pled guilty to one count of conspiracy to commit health care fraud and wire fraud, admitting that he and his co-conspirators used Medsel to fraudulently bill Medicare by submitting claims for home health care services that were not provided. Like Mr. Echavia, Hernandez also transferred his ownership to a co-conspirator. The Medsel fraud amounted to a loss of $950,000.

In *Hernandez*, the parties disagreed on the issue of role in the offense, with Probation recommending a Guidelines range of 70 to 87 months, the Government recommending a Guidelines range of 51 to 63 months, and Hernandez arguing for a Guidelines range of 33 to 41 months. *See* Def.'s Sen. Memo., Dkt. No. 43, *United States v. Dennys Hernandez*, Case No. 1:18-cr-20524-RNS-1, at 2 n. 1 (S.D. Fla. May 16, 2019). Hernandez was ultimately sentenced to 30 months, several years below Probation and the Government's recommendations and even below the 33 to 41-month Guidelines range proposed by the defendant. The *Hernandez* case provides a salient example of a court ordering a below-Guidelines sentence for a defendant with circumstances somewhat similar to Mr. Echavia's. But most notably, the underlying corporation in *Hernandez* was nothing but a shell company and did not provide services to anyone; Care Specialists *did* provide home health care services to patients, albeit not all the services that were ultimately billed. *See* Plea Agreement, *Dennys Hernandez*, Dkt. No. 29, Case No. 1:18-cr-20524-RNS-1, at 3-6 (S.D. Fla. Mar. 7, 2019). This suggests that a sentence several years (or more) below the low end of the presumptive Guidelines would be appropriate here.

***United States v. Diana Jocelyn Gumila,*** No. 14-cr-00411 (N.D. Ill. Jul. 26, 2016), ***judgment aff'd,*** *United States* v. *Diana J. Gumila*, 879 F.3d 831 (7th Cir. 2018).

The *Gumila* case, too, presents a similar set of factual circumstances and provides an instructive example of a below-Guidelines sentence serving as a court's response to the issue of a (potentially unfairly) inflated Guidelines range. Gumila, former manager of Suburban Home Physicians d/b/a Doctor at Home, was convicted on 21 counts of health care fraud and three false statements relating to a health care matter for directing employees to perform in-home visits with patients who were not homebound and for up-coding Medicare claims. The $15.6 million loss amount yielded a Guidelines range of 151 to 188 months. Tr. of Sen. Hr'g, *United States v. Diana Jocelyn Gumila*, Dkt. No. 127, Case No. 1:14-cr-00411-1, at 22 (N.D. Ill. July 26, 2016). The Government, Probation, and Gumila agreed that a sentence below this range would be reasonable but not greater than necessary. *Id*. at 26, 39-40. In fact, the *Gumila* Probation Officer (who is the same one assigned to the instant matter) recommended a sentence of 84 months, a sentence well below the applicable Guidelines range.[6] *Id*. at 39.

Judge Kocoras ultimately sentenced Gumila to 72 months, *less than half* of the applicable Guidelines range. In handing down the sentence, Judge Kocoras acknowledged defense counsel's proffered statistics—of all the fraud cases in 2015 (7,420 cases), the mean sentence was 27 months and the median sentence was 24

---

[6] Notably, the Probation Officer here recommends a sentence at the low-end. *See* Presentence Investigation Report, Dkt. No. 200, *United States v. Ferdinand Echavia*, Case No. 17-cr-455-1 (N.D. Ill. May 20, 2020).

months—and agreed that the Guidelines in Gumila's case were largely driven by loss amount. Judge Kocoras further explained that the $15.6 million loss amount resulted in a Guidelines range that he "happen[ed] to think" was "too high."

Respectfully, this is also the case for Mr. Echavia. The Guidelines range would impose a sentence greater than necessary to meet the purposes of § 3553. A sentence far below the Guidelines range, as was the sentence in the comparable *Gumila* case, is reasonable here.

***United States v. Rick Brown,*** **No. 13-cr-00854 (N.D. Ill. Sept. 4, 2015), judgment aff'd, *United States* v. *Rick Brown*, 880 F.3d 399 (7th Cir. 2018), cert. denied No. 17-9076 (Oct. 1, 2018).**

Finally, in the *Brown* case, the court ordered a sentence that significantly varied downward from the applicable Guidelines range, based on the defendant's history and characteristics—including, military service, community service, and age. Brown, president of an in-home visiting physician group, was convicted at trial for his leadership role in an alleged $4.5 million home Medicare fraud scheme. Brown and his co-conspirator fraudulently billed Medicare for home health care services that were never provided (e.g., the patients were dead at the time of purported services) and forged physician signatures on Medicare claim documents. The loss amount and absence of acceptance of responsibility yielded a Guidelines range of 121 to 151 months.

At sentencing, Judge Feinerman handed down a total sentence of 87 months, which he characterized as a "significant downward variance from the bottom end of the Guidelines range," and walked through each § 3553 mitigating factor that

informed his decision. Tr. of Sen. Hr'g, *United States v. Rick Brown*, Dkt. No. 386, Case No. 1:13-cr-00854-1, at 103 (N.D. Ill. Sept. 4, 2015). In particular, Judge Feinerman acknowledged that Brown served in the military for ten years; did not use "Medicare fraud to lead a life of luxury, [...] as there was no indication of any luxury purchases"; despite the fact that he committed fraud, exhibited a genuine devotion to the medical profession; positively impacted the lives of others through community service; and, would reach the age of 65 during his prison term. *Id.* at 103-105.

Most of these mitigating personal characteristics are also true for Mr. Echavia. Though he did not actively enroll in the military, Mr. Echavia served as a nurse on a military base in Saudi Arabia, caring for wounded soldiers for over six years. There is no evidence of luxury purchases here, much less any increase in wealth. Mr. Echavia's financial disclosures to Probation show a negative net worth. He is on a path to losing his family's home and has struggled to pay his gas bills. Mr. Echavia's true passion was and still is nursing, and though he exhibited categorically poor judgment in operating Care Specialists, he did care for his patients. Mr. Echavia's son, Kurt (who is currently in nursing school in the Philippines), noted this in his character letter: "[s]eeing the passion that my father had for working as a nurse and how he would build rapport with his patients influenced me to choose the same career path as him." *See* Exhibit F. Mr. Echavia devoted time to community service in his Filipino community and in Chicago in the wake of the COVID-19 pandemic. And finally, at 47, Mr. Echavia is of an advanced,

non-reoffending age per the age-crime curve (discussed further immediately below). These personal characteristics warrant a significant downward variance here, as they did in Mr. Brown's case.

These three cases involved similar home health care fraud conspiracies, similar acts in furtherance, similar Guidelines ranges, and defendants with similar mitigating characteristics and represent just a sample of cases comparable to Mr. Echavia's. In each of these cases, a federal court determined that a sentence well below the Guidelines range was "sufficient, but not greater than necessary" to comply with the sentencing considerations set forth in section 3553, post-*Booker*. There is nothing about the circumstances of this case, the nature of the conduct generally, or Mr. Echavia in particular, that warrants a disparate sentence. *See* 18 U.S.C. § 3553(a)(6).

## III.   PRESENTENCE INVESTIGATION REPORT CLARIFICATION

Mr. Echavia respectfully submits the following clarification to the Presentence Investigation Report ("PSR"):

### A.    Paragraph 17 - The Offense Conduct

In its discussion of the offense conduct, the PSR states that "Mr. Echavia was responsible for assessing new Care Specialists' patients to determine whether they met Medicare's requirement for home health care.  In order to qualify for such, patients were required to be homebound and unable to leave the home for medical care."  PSR at ¶ 17.  This paragraph overstates Mr. Echavia's responsibility in determining the "homebound" status of new patients.  Yes, Mr. Echavia and other Care Specialists nurses would assess whether new patients met the homebound criteria as part of the company's intake process but only after a *physician* had also evaluated the patient and separately determined that the patient was eligible to receive home health care services.  A physician would conduct an in-person assessment of a new patient, determine whether the patient met the "homebound" criteria per Medicare regulations, and if so, certify the patient's eligibility on what was called the "Face-to-Face Encounter" Form.  Paragraph 17 should be clarified to include the physician's role in this "homebound" evaluation.

## IV.   CONCLUSION

After considering the United States Sentencing Guidelines and the § 3553(a) factors as applied to the facts of this case, Mr. Echavia respectfully asserts that a

sentence between 36 and 48 months, with conditions deemed appropriate by the Court as sufficient but not greater than necessary, would be appropriate to satisfy the purposes of sentencing in his case. Mr. Echavia has demonstrated an acceptance of responsibility for his actions and has already paid a severe personal price for his misconduct, and such a sentence is in line with sentences imposed in comparable cases.

Dated: July 6, 2021

Respectfully submitted,

MR. FERDINAND ECHAVIA

By:_____
Attorneys for Ferdinand Echavia
Pravin Rao
Jon R. Buck
Margaret Smilowitz

Perkins Coie LLP
131 S. Dearborn Street, Suite 1700
Chicago, IL 60603
prao@perkinscoie.com
jbuck@perkinscoie.com
msmilowitz@perkinscoie.com